[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs own and operate a liquor store at 544 Congress Avenue in New Haven. When they purchased that business, they entered into a contract with the defendant to provide them monitoring and security services, implemented by a burglar alarm system on the premises (hereinafter, the BA Contract). This contract obligated the plaintiffs to pay a monthly service fee.
On October 13, 1998, the parties entered into a contract under which the plaintiffs acquired a closed circuit television system (the CCTV Contract). This involved the installation of cameras at three locations and a monitor which permitted a variety of scanning, isolation of areas, and zooming in of areas. In addition to the installation, the defendant undertook to demonstrate the system and its features to the defendants so CT Page 2364 that they could take advantage of the various features which made it an appropriate purchase for them. It must be noted that for these buyers, the plaintiffs, the English language is not their native tongue and the defendant's agent or employees should have recognized that fact and their particular need for proper instruction — particularly in the case of Mr. Flores who was the principal operator of the liquor store.
There appears to be no question that at the end of the work day for the defendant's technicians, there was additional work to be performed by the defendant. An examination of the defendant's job work orders, Exhibits B and C, indicates equipment was installed on one day from 9:00 a.m. to 4:00 p.m. and on a subsequent day from 8:00 a.m. to 9:30 a.m. This latter order, Exhibit C, is marked "Must return" and indicates a different camera lens must be tested and the system demonstrated to the buyers. The plaintiff's claim these steps were never taken and the defendant has not rebutted that assertion.
The plaintiffs proceeded to make the payments called for by the two contacts and called the defendant repeatedly to complain about various problems they were encountering and the need for them to learn to operate the system's various features. The defendant failed to offer an explanation for the apparent failure to respond to the plaintiffs and finally, on March 4, 1999, the plaintiffs sent by certified mail a notice of cancellation which the defendant received on March 10.
The plaintiffs did not make the payment due in March.
The defendant apparently did nothing until June 9, 1999 when a demand letter was sent to the plaintiffs advising them of their account arrearage but making no mention of the plaintiffs' complaints nor of their March letter. However, this letter from the defendant's files and offered by the defendant (Exhibit 2) bears this statement, written across the upper portion of the item in blue ink "waiting for serv (sic) of CCTV." This had to have been placed on the letter by an employee or agent of the defendant.
When a visit by the defendant's sales representative failed to resolve the problems, this suit followed. At that visit, the plaintiffs protested the passage of almost seven months since installation without service, the failure to properly focus cameras, the lack of instruction on the system, and the defendant's insistence that they make up the payments from March.
In this action, the plaintiff allege a breach of contract and enunciate a variety of damage claims. The defendant has asserted five special defenses and interposed a two count counter-claim, alleging a breach of CT Page 2365 both contracts by the plaintiffs. A return of the installed equipment is also sought.
 DISCUSSION I The CCTV Contract
Upon signing this contract, the plaintiffs paid $3,180.00, representing a $3,000.00 "sale and/or installation charges" and $180.00 sales tax. For 24 months they agreed to pay $150.00 as "other" and $9.00 sales tax. At the end of that 24 month period, if payments were timely made, the entire system could be purchased for $1,000. However, the $159.00 payments are entitled "Total Monthly Recurring Service Charge," suggesting that the plaintiffs paid for this equipment with the $3,180.00 payment and that the $159.00 payments were a service charge.
This premise is consistent with the defendant's demand letter of June 9, 1999 (Exhibit 2). No mention is made of a return of equipment belonging to the defendant, nor can the court find any language in the CCTV Contract even suggesting a lease, as the defendant claims in its counter-claim.
Yet, the contract refers to the system as "company owned", and no
recurring services are indicated as being provided. But then the payment schedule does refer to a monthly service charge of $159.00 as mentioned above. The only written statement regarding a lease is found in Exhibit D, a letter signed by the parties on October 13, 1998, the effective date of the basic contract. This document suggests a sale and lease with a one year "warranty" included, and "service and maintenance contract available after the one year.
Mr. Flores testified that his repeated calls to the defendant for service were ignored and he even spoke to a Spanish speaking employee of the defendant, a Mr. Morales. The witness for the defendant identified Mr. Morales as an employee at the central station. Up to the time the plaintiffs sent the cancellation letter in March, no demonstration or instruction had been given, the cameras located in the storage area and exterior were not functioning to their satisfaction, and after the CCTV installation, phone calls were constantly being interrupted.
With this background, the court is left to ponder just what the defendant was doing until June 1999. The court believes Mr. Flores' testimony about his problems and his complaints, but that aside, the defendant has not explained why it took from March to June to react to CT Page 2366 the cancellation letter (Exhibit E).
In substance, the plaintiff's version of the sequence of events is supported by the defendant's own documents: the work orders and the payment schedule. The defendant was unable to rebut any of the plaintiff's testimony and admitted that the contract had not been fully performed!
While Mr. Sintay and Mr. Flores were not in total agreement as to their conversation in June 1999, that episode was virtually irrelevant as to the main issue in this case. What appears to be unquestioned is that the defendant had corrective work to perform to complete the system and the necessary instruction to enable the plaintiffs to operate the system had not been offered. Putting aside for a moment the other complaints, this constitutes a breach of the contract and puts the defendant in the position of demanding payments for something it had not completed and for a system the plaintiffs could not use.
And, when Mr. Flores and Mr. Sintay met in June, it was not unreasonable for Mr. Flores to demand some accounting for the period during which the CCTV system was not totally functional. At that meeting, Mr. Sintay found a defect which, though easy to fix, was different from the earlier complaints described by Mr. Flores.
The defendant, at that point, was hardly in a position to demand the plaintiff's performance of the contract while excusing its own obligations. Its response to the plaintiff's request for attention and service does not reflect a course of fair dealing. And, in view of its breach of contract, the second count of the defendant's counterclaim must fail. Mr. Flores had other complaints which were ignored: he was unable to call up the three pictures from the three cameras on one screen and one camera was not set to cover the whole store. The store room camera lens had not been replaced. He also complained of problems with the system cutting off phone calls.
 The BA Contract
Turning next to the original contract, Exhibit 1, this item is not part of the complaint but is the subject of the first count of the defendant's counterclaim.
There is no question that this agreement was entered into before the CCTV contract. While the defendant argues that it is an entirely separate argument, the plaintiff's claim they requested that the two contracts be merged into one and that they receive one monthly bill for the total services under both contracts. Exhibit F seems to support that contention with both charges appearing on a single statement and the sales tax CT Page 2367 computed as to the total of the two. This is also reflected in Exhibit 5, the defendant's "account history".
Thus, the defendant's breach of the CCTV contract would, in effect, amount to a breach of the BA contract as well and the court concludes that there is sufficient evidence to support this theory.
However, there is additional evidence to support a finding that the defendant's behavior was such as to amount to a breach of the BA contract, if that contract were to be considered a separate one.
Mr. Flores testified that one of the complaints he had made to the defendant was that his phone calls were being cut off. His description of the problem was at odds with Mr. Sintay's explanation. Mr. Sintay said this "phone interference" was minimal, occurring once a day for a matter of seconds when the BA system "tested itself", a positive feature.
But it should not take a provider almost nine months to look into a customer's complaint of a malfunction which could affect his business, his security or both. This defendant never bothered to find out what the complaint was and what the cause was.
It is therefore the conclusion of the court that the defendant's first count of the counterclaim must be rejected and support for that result can be found on both theories as discussed above.
It should also be noted that if one were to treat the BA contract separately, the had the right to rescind or cancel for the defendant's failure to perform under paragraph 2 of the agreement, (Exhibit 1) wherein the defendant undertakes to maintain the system provided it receives "prompt notification" of any defects. It certainly received this and Mr. Sintay apparently recognized the nature of the problem, explaining it in his testimony. We don't know if the system was "testing itself" daily, hourly, or at all, unfortunately.
 III The Special Defenses of the Defendant
The defendant has interposed five special defenses with which the court will deal as follows:
A. The first and third special defenses address the plaintiff's claims for damages. The defendant argues that paragraph 2 of the CCTV contract limits to $250.00 any liability of the defendant. The court disagrees. This paragraph addresses "active or passive negligence" or a failure on CT Page 2368 the part of the defendant "to perform any of its obligations hereunder.
The court does not construe this language to permit the defendant to fail to complete the contract and then to use the contract terms to protect itself. Further, it would be contrary to equitable principles and public policy to permit the defendant to be protected from acts which border on wanton or careless misconduct, acts which would warrant application of the Connecticut Unfair Trade Practices Act.
B. The second special defense alleges that within days of the installation, the plaintiffs refused to allow the defendant to enter the premises to train them to operate the system.
This is completely contrary to the evidence and the defendant offered absolutely nothing to justify this assertion. It therefore does not serve to waive any warranty or otherwise estop the plaintiffs.
C. The fourth special defense is precluded by the court's decision with respect to the defendant's breach of the BA contract. That breach excuses the plaintiffs from making the remaining payments.
D. The fifth and last special defense is a "three in one" attack on the plaintiffs, contributory negligence. First. it is alleged the plaintiffs failed to allow the defendant access to the system. It is then alleged they refused to learn the proper operation of the system! And, finally, the claim is that the plaintiffs waited "an unreasonably long period of time, four months, before reporting difficulties to defendant."
Not only was the evidence in complete contradiction of these "defenses," but the defendant's own records showed it had never returned to train the plaintiffs and waited until June, almost nine months, to even visit the store.
If Mr. Flores, were to be totally disbelieved as to his phone call complaints, the had his letter of March 4th. Even that was ignored until June!
The special defenses are found to be without merit and are rejected in toto. Further, the court will invoke Section 10-5 of the Practice Book and impose sanctions for "Untrue Allegations or Denials" with respect to the second and fifth special defenses.
For the second special defense, the sum of $50.00 is taxed, and for the fifth special defense the sum of $150.00 is taxed for a total of $200.00. CT Page 2369
 CONCLUSION
Addressing an equitable assessment of damages presents the court with some conflicting considerations, not the least of which is the fact that the defendant's equipment has been out of its possession and non-productive two years. However, as between the parties, fault for this debacle lies primarily with the defendant.
Therefore, it is the conclusion of the court that the plaintiffs should recover of the defendant:
All sums paid on the CCTV contract, including:
 Down payment $3,180.00 Four installments 636.00
$3,816.00 Interest 2/13/99 — 2/13/01 763.20
$4,579.20
Judgment may enter for the plaintiffs against the defendant for $4,579.20 plus taxable costs.
As part of this judgment, with the plaintiff's statement on the record in mind, upon payment of said judgment, the defendant shall be permitted to remove all of its leased equipment from the plaintiffs' property.
The plaintiffs' other claims for damages have not been proven, nor has the defendant proved its claim for quantum meruit.
The payments made under the burglar alarm contract will not be addressed nor there was no evidence security was affected by any malfunction for the period to the cancellation notice.
Anthony V. DeMayo, J.T.R.